[Criminal No. 273.    Filed March 20, 1909.]

[100 Pac. 450.]

In the Matter of the Application of BY–A–LIL–LE, POLLY, SISCO, BY–A–LIL–LE–BE–TAH, Sr., AT–CITY, BIS–CLA–E, THA–EL–CHEE–NAH–KI–BE–GA, and CLIZ–E–SLON–BE–GA, for a Writ of Error.

1. INDIANS — PUNISHMENT OF INDIANS — STATUTORY AUTHORITY.—Revised Statutes of the United States, section 2149, authorizing the commissioner of Indian affairs to remove from any tribal reservation any person whose presence within the reservation may be detrimental to the peace and welfare of the Indians, etc., only authorizes the removal of troublesome persons from a reservation, and does not imply authority to detain them in confinement after such removal.

2. INDIANS—"PRISONERS OF WAR"—REMOVAL FROM RESERVATION.—On the representations of the Secretary of the Interior, the Secretary

of War sent troops into the vicinity of an Indian reservation to serve as a repressing influence on the Indians, a group of whom, under a leader, threatened trouble. The officer in command arrested the leader and some of his immediate followers. While the arrest was made, the troops were fired on by other Indians, and the fire was returned. The Indians arrested were, on the recommendation of the Secretary of the Interior, confined for an indefinite period at hard labor, on condition that they could be released whenever it might be deemed wise to, do so. *Held,* that the Indians were not "prisoners of war," and their detention could not be justified on the ground that a state of war existed.

3. INDIANS—PUNISHMENT OF INDIANS—REGULATIONS.—Though the Indians are the wards of the United States, acting through executive officers pursuant to regulations promulgated under the authority of the President, pursuant to Revised Statutes of the United States, sections 463, 465 (U. S. Comp. Stats. 1901, pp. 262–264), yet in the absence of such regulations defining what conduct of Indians shall be deemed reprehensible and subject them to correction, it does not rest in executive discretion to administer corrective punishment; and particularly is this true as to members of a tribe having a treaty with the United States, covenanting that bad Indians shall not be punished by the United States except pursuant to laws defining their offenses and prescribing the punishments therefor.

APPEAL from a judgment of the District Court of the Second Judicial District, in and for the County of Cochise. Fletcher M. Doan, Judge. Reversed.

The facts are stated in the opinion.

O. Gibson, for Petitioners.

J. L. B. Alexander, United States Attorney, for the United States.

NAVE, J.—A group of Navajo Indians under the leadership of By-a-lil-le threatened serious trouble upon the Navajo reservation. Upon the representations of the Secretary of the Interior the Secretary of War sent two troops of cavalry into the vicinity of the reservation to serve as a repressing influence upon the Indians. After a conference with the Indian agent, the officer in command of the troops determined it to be wise to arrest By-a-lil-le and certain of his companions. Accordingly he made a night march to By-a-lil-le's camp, and captured him and his immediate followers about daybreak the next morning. While this arrest was being

made, the troops were fired upon by other Indians in the vicinity. The fire was returned. The casualties were two Indians killed and one wounded; except that a horse of one of the soldiers was killed. Upon the recommendation of the Secretary of the Interior, without a trial or hearing of any sort, By-a-lil-le and seven of his companions were transported to Ft. Huachuca, Arizona, "where," to quote the Secretary of the Interior, "they are to be confined for an indefinite period at hard labor. They can be released whenever it may be deemed wise to do so, each case to be considered on its own merits. The time for the release of these prisoners has been left to the judgment of the War Department." These Indians, setting up in detail the facts of which the foregoing statement is a brief abstract, and averring that their detention is unlawful, petitioned the district court of the second judicial district for a writ of habeas corpus, directed to the commanding officer at Ft. Huachuca to the end that they be discharged. The writ was denied, and from its denial petitioners have prosecuted this appeal. The contention of petitioners is that they are deprived of liberty without due process of law, in contravention of article 5 of the amendments to the constitution of the United States.

The detention of these Indians is supported by the respondent upon three contentions. One of these contentions is that it is authorized by the provisions of section 2149, Revised Statutes of the United States, which reads as follows: "The commissioner of Indian affairs is authorized and required, with the approval of the Secretary of the Interior, to remove from any tribal reservation any person being therein without authority of law, or whose presence within the limits of the reservation may, in the judgment of the commissioner, be detrimental to the peace and welfare of the Indians; and may employ for the purpose such force as may be necessary to enable the agent to effect the removal of such person." The inadequacy of this contention is self-evident. Authority to remove troublesome persons from a reservation does not imply authority to detain them in confinement after such removal. Hence the detention of these Indians is not maintainable by reason of the provisions of this section or of any of its implications.

The second contention is that the facts disclose the petitioners to be prisoners of war, and hence lawfully to be held in military custody. We do not infer from the facts that a state of war existed at the time of the apprehension of the petitioners, nor does it appear that it was or is the view of the Secretary of the Interior or of the Secretary of War that a state of war existed then, or exists now, between the Indians and the United States. It affirmatively appears that though in the custody of the War Department, these Indians are maintained at the expense of the Interior Department, and are to be confined at hard labor for an indefinite period as a punishment to them and an object lesson to the rest of their tribe, in the language of the Secretary of the Interior, because they "have defied the government and its authorities; they have impeded the progress of the other Indians in their efforts to improve and better their condition; they armed themselves, . . . threatened to kill any person or persons who molested them, and fired first upon United States troops in the discharge of their duty." Confinement at hard labor is a characteristic of the punishment of criminals, and not, under the code of modern civilized warfare, an incident of the detention of prisoners of war. We do not assume that we have jurisdiction to interfere with the treatment accorded them, were they, in fact, prisoners of war; but we point to the fact of their confinement at hard labor as inconsistent with a theory that they are regarded by the executive departments as prisoners of war. The consideration and freedom from unnecessary restraint which, within our judicial knowledge, marked the detention of Spanish prisoners during our recent war, and has marked the detention, as prisoners of war, of Geronimo and his band of Apaches, warrant, as fully as our patriotic pride also demands, that we attribute to the executive departments the most enlightened chivalry in their attitude toward prisoners of war. It is manifest that petitioners are not prisoners of war.

As a third contention it is urged with great earnestness that the Indians are but wards of the government, and therefore are subject to administrative correction of their conduct as are other wards to the correction of their guardians; that the disposition which has been made of these Indians is pursuant to a long-followed policy of the Departments of the

Interior and of War, and that it is highly salutary in safeguarding the relations of the Indians to the government and to their white neighbors and, indeed, among themselves. However salutary in its results and desirable such a method of dealing with recalcitrant Indians may be, and however long such a system may have prevailed, it cannot be sanctioned, unless there is authority for it in the acts of Congress. Indians are not wards of the executive officers, but wards of the United States, acting through executive officers, it is true, but expressing its fostering will by legislation. We may pass, as unnecessary to determine, the question whether Congress may constitutionally vest in executive officers such summary authority as is here sought to be exercised. Our attention has not been directed to legislation expressly authorizing such summary methods. Comprehensive authority is conferred upon the President by sections 463, 465 of the Revised Statutes of the United States (U. S. Comp. Stats. 1901, pp. 262–264), to control the conduct of Indian affairs by his regulations; but we do not find a general rule or regulation promulgated by or under the authority of the President applicable in this case.

The supreme court of the United States in *Bad Elk* v. *United States*, 177 U. S. 529, 20 Sup. Ct. 729, 44 L. Ed. 874, has held that an executive officer in the Indian service has no authority to direct arrests in the absence of law, rule, or regulation authorizing such direction, and that the conduct of an Indian is not to be held misbehavior in the absence of a law, rule, or regulation so defining it. Among the necessary implications of that decision is that, there being no law, rule, or regulation defining what conduct of Indians shall be deemed reprehensible and subject them to correction, it does not rest in executive discretion to administer corrective punishment. We deem this conclusion inevitable, and determinative of this case irrespective of the question whether such summary discipline might be sustained if pursuant to a rule or regulation.

The position of these particular petitioners, members of the Navajo Tribe, is fortified by one of the stipulations of the treaty between the United States and the Navajoes, which is as follows: "If bad men among the Indians shall commit a wrong or depredation upon the person or property of anyone, white, black or Indian, subject to the authority of the United

States and at peace therewith, the Navajo Tribe agree that they will, on proof made to their agent, and on notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws.'' Article 1, Treaty of June 1, 1868; 15 Stat. 667. This stipulation amounts to a covenant that bad Indians shall not be punished by the United States, except pursuant to laws defining their offenses and prescribing the punishments therefor. While Congress by its legislation may disregard treaties, the executive branch of the government may not do so. The district court was in error in denying the writ of *habeas corpus*.

The proceedings in the court below were solely upon the petition. The United States attorney appeared on behalf of the United States, and argued against the granting of the writ without filing a demurrer or other formal pleading. The trial judge rendered an opinion in writing, which appears as part of the record, in which we find: ''It has been suggested by the court, and agreed to by counsel, that, in effect, the ruling may be as though the writ had been granted and the applicants were here in person before the court. . . . If the writ should be granted by the court, the granting of the writ would be equivalent to the release of the applicants for the writ, and the writ will not be denied unless the court is satisfied from the hearing that the applicants would be remanded to the custody of those now having them in charge.'' The petition contains at full length what purport to be all of the proceedings of the Departments of the Interior and of War, resulting in the detention of petitioners. In view of that fact, we construe the expression of the trial court as disclosing the stipulation that, if the facts upon the petition disclose that petitioners are entitled to be discharged, the judgment of the court should be to discharge them.

Therefore it will be adjudged that the judgment of the trial court be reversed and that the petitioners be discharged, with leave to the respondent, however, to present, within fifteen days, reasons, if any there be, why instead of discharging the petitioners we should remand the cause, with direction to the trial court to grant the writ.

KENT, C. J., and SLOAN and CAMPBELL, JJ., concur.

NOTE.—As to jurisdiction to punish crimes committed by or against Indians, see note to *State* v. *Campbell* (Minn.), 21 L. R. A. 169.